JOSEPH SANGIRARDI, Plaintiff-Appellant, v. THE VILLAGE OF STICKNEY *et al.*, Defendants-Appellees.

First District (1st Division)    No. 1—02—1339

Opinion filed June 30, 2003.

4

James T. Harrison, of Harrison Law Offices, of Woodstock, for appellant.

Donald J. Freger and Ruth E. Krugly, both of Schiff, Hardin & Waite, of Chicago, for appellees Village of Stickney and John Zitek.

Kenneth C. Shepro, of Katz, Randall, Weinberg & Richmond, of Chicago, for other appellees.

JUSTICE SMITH delivered the opinion of the court:

Plaintiff Joseph Sangirardi was discharged from his duties as a Stickney police officer by defendants Village of Stickney (Village), Village chief of police John Zitek (Chief Zitek), Village Board of Fire and Police Commissioners (the Board), and board commissioners Edwin Noska, James Bernard and Fred Schimel. Plaintiff filed an action for administrative review of the Board's decision. The circuit court of Cook County affirmed the Board, and plaintiff appealed.

On appeal, plaintiff contends that he was deprived of his due

process rights, alleging that the Board was biased due to *ex parte* communications, violated the Open Meetings Act (5 ILCS 120/1 *et seq.* (West 1998)), and improperly subjected plaintiff to disciplinary action when he invoked the Mental Health and Developmental Disabilities Confidentiality Act (740 ILCS 110/1 *et seq.* (West 1998)) to prevent disclosure of his psychological evaluation results. Plaintiff also contends that the Board's findings of fact were against the manifest weight of the evidence. Moreover, plaintiff contends that the Board's finding that cause existed to discharge him was arbitrary, unreasonable and unrelated to the requirements of service. For the reasons that follow, we affirm.

## BACKGROUND

Plaintiff was employed as a police officer for the Village from July 1988 until February 1999. In a letter to the Board dated June 15, 1998, Chief Zitek expressed concern that plaintiff's escalating misconduct was compromising the police department and asked the Board to consider appropriate professional counseling for plaintiff or disciplinary action. In the letter, Chief Zitek alleged that plaintiff was not understanding and considerate when handling juvenile situations; did not accept advice from superiors; displayed poor judgment in performing his duties; had difficulty in making a good impression when dealing with the public; and violated the conflict of interest and fairness and impartiality provisions of the code of ethics. The letter referred the Board to "[s]ee attachments and reference to various reports and documents."

On June 16, 1998, the Board convened, reviewed Chief Zitek's June 15 letter and sent Chief Zitek a letter recommending, *inter alia*, that plaintiff undergo a psychological evaluation and that disciplinary action be taken pending the results of the professional evaluation.

In June, July and August of 1998, Chief Zitek ordered plaintiff to undergo a psychological evaluation to determine his fitness for duty (fitness exam) as a result of incidents involving plaintiff's slamming of a police car door and actions pertaining to a juvenile. Although plaintiff reported for the scheduled fitness exams, the exams were not administered or completed because plaintiff would not sign certain forms or consent to release the results of the fitness exam to Chief Zitek. On September 3, 1998, Chief Zitek again ordered plaintiff to undergo the fitness exam rescheduled for September 15, 1998, and to release the results to Chief Zitek. Plaintiff submitted to that fitness exam, which was conducted by psychologist Harry E. Gunn.

On September 23, 1998, Chief Zitek wrote the Board a letter requesting review of plaintiff's action of assisting the North Riverside

police department without prior authorization from his superiors. The letter also referred to "attachments" and "various reports and documents." The Board convened on September 25, 1998, and reviewed Chief Zitek's letter.

On Saturday, October 10, 1998, Chief Zitek issued an order noting that plaintiff had participated in the fitness exam, that Dr. Gunn had issued a report of the result of that exam, and that plaintiff refused to release that report. Chief Zitek ordered plaintiff to release that report within 48 hours.

On October 15, 1998, Chief Zitek filed with the Board formal disciplinary charges against plaintiff, alleging (1) that on October 12, 1998, plaintiff refused to obey Chief Zitek's order to release to Chief Zitek the results of plaintiff's fitness exam (hereinafter, the insubordination charge); (2) that in September 1998, plaintiff assisted the North Riverside police department without prior approval from his superiors and then demonstrated disrespect to a superior officer in a letter to the North Riverside police department; (3) that on June 18, 1998, plaintiff damaged a police car by closing the car door with excessive force and openly criticized Chief Zitek in the presence of another officer; and (4) that on two separate occasions in 1997, plaintiff handcuffed a juvenile and then made false statements regarding each incident. The Board issued a written order suspending plaintiff without pay and scheduled a hearing date for the charges.

The parties stipulated that plaintiff was not notified of the Board's meetings on June 16, September 25 and October 15, 1998; plaintiff was not present at those meetings; minutes were not taken of those meetings; and those meetings were not transcribed.

On October 23, 1998, the Board convened, appointed special counsel to the Board, and amended its October 15 order to reschedule the hearing and reinstate plaintiff's pay during his suspension. Prior to the hearing, plaintiff requested production of the documents attached to Chief Zitek's June 15 and September 23, 1998, letters; however, the attachments were not produced prior to the final administrative decision by the Board.

On October 26, 1998, Chief Zitek filed an additional charge, alleging that on March 17, 1998 (later amended to March 18, 1998), plaintiff verbally threatened a local businessman, later identified as Terry Cleary, with whom plaintiff was involved in litigation (hereinafter, the Cleary charge).

### The Administrative Hearing

The administrative hearing commenced in November 1998 and was bifurcated to first address the validity of the charges and then, if

necessary, to consider the appropriate disciplinary sanction. However, in December 1998, the Board dismissed on jurisdictional grounds the three charges pertaining to the incidents involving the North Riverside police department, the slammed car door, and the juvenile. The Board found that those three charges were barred because they had been the subject of prior communications from Chief Zitek to the Board and thus constituted a filing of charges without a hearing having been commenced within 30 days of those communications. Accordingly, the hearing proceeded only on two charges—the insubordination charge and the Cleary charge. Prior to the commencement of the evidentiary portion of the hearing, counsel to the Board advised and admonished the Board that it:

> "may not and should not consider any materials, information, communications, documents or otherwise which were received by it from any source whatsoever outside of the formal hearing process, and this Board must conduct its hearing and [reach its] decision based solely on the evidence that is presented and the testimony that is presented during the hearing which [the Board has] now scheduled."

Plaintiff was represented by counsel, and over several hearing sessions the Board heard testimony from nine witnesses and received numerous exhibits from the parties.

Terry Cleary testified that he was the chief executive officer of Suburban Fence, Inc., and in July 1997 entered a contract to build a fence at plaintiff's home. Thereafter, Cleary filed a lawsuit to recover the balance due, and the trial court entered judgment for Cleary on March 17, 1998. Cleary testified that plaintiff was upset by the verdict, loudly called Cleary a thief, and was restrained by plaintiff's own lawyer. Plaintiff and his witness, Charles Daniels, a lumber salesman, essentially corroborated Cleary's testimony, although they characterized the conflict as verbal and nonthreatening.

Cleary also testified that on the morning of March 18, 1998, he received a telephone call at his Cicero office at 708-652-7259 and immediately recognized plaintiff's voice. Cleary testified that plaintiff threatened to use Cleary's face to play curb racquetball and that Cleary could be hit in the head with his own two-by-fours or run over by a bus. Cleary reported the telephone call to the Cicero police department, which dispatched police officer Louis Sedlacek to the scene. Although Cleary told Officer Sedlacek the details concerning the threats, Cleary did not review Officer Sedlacek's report, which incorrectly indicated that Cleary's office telephone had "Caller ID." Moreover, Officer Sedlacek's report incorrectly listed 708-383-5000, the telephone number of Cleary's Oak Park branch office, as the telephone number of Cleary's Cicero office.

Cicero police officer Sedlacek testified that although Cleary told him about the threat involving the bus, Officer Sedlacek failed to include that threat in his report. Officer Sedlacek testified confusingly and inconsistently concerning the notation in his report that the "Caller I'D [*sic*] displayed phone number of 708-652-7259 to which call came from" and concerning whether he authored the entire police report.

Plaintiff's wife Jackie Sangirardi testified that both she and plaintiff were asleep at the time the alleged telephone threat took place.

Plaintiff testified that he did not threaten Cleary on March 18, 1998, and was asleep when the alleged threat was made. Plaintiff also testified that although he complied with each order directing him to report for testing, the fitness exam was not actually conducted until September 15, 1998. During the attempted fitness exams, plaintiff informed the examiners that he had been ordered to sign the release and that he did not waive his rights to confidentiality of his mental health records. As a result, the examiners refused to administer the exam. When plaintiff submitted to the fitness exam on September 15, 1998, he agreed that Dr. Gunn would release copies of plaintiff's fitness report to plaintiff's attorney and to Chief Zitek's attorney. Dr. Gunn prepared two reports, one shortly after the September 15 exam and the other, an update, in early October. Plaintiff's attorney and Chief Zitek's attorney received those reports by October 5, 1998.

Plaintiff testified that by Thursday, October 8, 1998, he directed his attorney to inform Chief Zitek's attorney that plaintiff would not agree to an *in camera* review of his fitness report until after another expert either tested plaintiff or reviewed Dr. Gunn's report. The parties stipulated that plaintiff's attorney never moved a court to conduct an *in camera* review of Dr. Gunn's report, and no *in camera* review was ever conducted.

Plaintiff testified that, about 6 p.m. on Saturday, October 10, 1998, he received Chief Zitek's order to release the fitness exam results to Chief Zitek within 48 hours. Plaintiff also testified that he understood that as of 6:05 p.m. on Monday, October 12, 1998, he had officially refused to obey Chief Zitek's October 10 order.

Chief Zitek testified that he was employed as the Village chief for six years and previously was employed by the Chicago police department for 32 years. In ordering plaintiff to undergo the fitness exam, Chief Zitek considered a detective's reprimand of plaintiff, a letter from the mother of a juvenile handcuffed by plaintiff, an officer's report regarding the car door slamming incident, and a sergeant's report regarding plaintiff's conduct during a "DUI" arrest. According

to Chief Zitek, he did not seek the entire results of plaintiff's fitness exam, but sought only Dr. Gunn's determination of whether plaintiff was fit for duty.

Plaintiff called three witnesses to support his contention that Chief Zitek filed the disciplinary charges based on his personal animosity toward plaintiff. Specifically, Donna Jahiri testified that Chief Zitek seemed upset in October 1998 when she suggested that plaintiff should be assigned to traffic duty at the local school. Further, Mary Matis testified that she wrote a letter to the police department and the Village thanking several officers, including plaintiff, for their efforts in locating her lost child during the summer of 1998. According to Matis, Chief Zitek contacted her on September 11, 1998, and asked her to correct her letter to credit the particular officer who had actually located Matis's child. In addition, Loretta Reese testified that in July 1998 or later Chief Zitek spoke to her about an incident involving her arrest by plaintiff and inquired whether she had obtained a lawyer with respect to that incident. Reese, however, could not recollect certain events despite several attempts by plaintiff's counsel to refresh her recollection with her affidavit.

During closing argument at the administrative hearing, plaintiff's counsel again raised the issue of plaintiff's request to Chief Zitek and the Board to produce the missing attachments to Chief Zitek's June 15 and September 23 letters. Counsel to the Board stated on the record that he and the Board looked for the attachments, which pertained only to the dismissed charges, and were not able to identify or find any specific attachments from any of the records in their possession. On January 20, 1999, the Board sustained the insubordination and Cleary charges against plaintiff and then on February 11, 1999, heard additional evidence and argument concerning the appropriate sanction.

### The Final Administrative Decision

On February 17, 1999, the Board issued a final administrative decision, finding that the insubordination and Cleary charges independently warranted plaintiff's discharge from employment. The Board noted that it was:

> "mindful of the admonition of its counsel that prior communications to the Board from [Chief Zitek] must be disregarded in the Board's consideration of the charges presently before it, and in connection with any disciplinary sanction to be imposed. In fact, those prior communications were the basis for this Board's decision to dismiss all charges which were the subject of those prior communications."

Regarding the insubordination charge, the Board noted the public

interest in assuring that officers have the psychological stability to properly perform all necessary duties and found that Chief Zitek had reasonable cause to order the fitness exam. The Board also found Chief Zitek's testimony straightforward, whereas plaintiff's evidence of alleged animosity was unpersuasive because it consisted of incidents that occurred while plaintiff was negotiating whether and when to obey the order to take the fitness exam and release the results. The Board determined that Chief Zitek's order was lawful, direct and unequivocal and that plaintiff's continued refusal to obey that order undermined the good order and discipline of the police department.

Regarding the Cleary charge, the Board found Cleary's account of plaintiff's telephone threats credible and supported by the evidence. Cleary was vigorously cross-examined and impressed the Board with his demeanor, straightforward answers and candor. Moreover, Cleary's account of the telephone threat was supported by evidence of plaintiff's animosity toward Cleary in the courtroom on March 17 and was not impeached by Officer Sedlacek or plaintiff's wife, who acknowledged that she was asleep when the telephone threat occurred.

The Board determined that plaintiff's insubordinate conduct justified discharge where plaintiff delayed taking the fitness exam, never complied with the order to release the exam results, and never requested additional time to attempt to comply with the order despite his opportunity to consult his counsel. Moreover, a disciplinary sanction other than discharge would have deprecated the seriousness of the Cleary offense where plaintiff's direct and specific threats of personal violence violated the rules and regulations of the department, potentially violated the State's criminal laws, were antithetical to the position and duties of a police officer, and brought disrepute upon the entire police department.

The circuit court of Cook County denied plaintiff's petition for administrative review and affirmed the Board's decision. Plaintiff appealed.

## DISCUSSION

### Standard of Review

■ On appeal, this court reviews the administrative agency's decision and not that of the circuit court. *Krocka v. Police Board of the City of Chicago*, 327 Ill. App. 3d 36, 46 (2001). An administrative agency's decisions on questions of fact are entitled to deference and are reversed only if against the manifest weight of the evidence. *Launius v. Board of Fire & Police Commissioners*, 151 Ill. 2d 419, 427 (1992). However, questions of law are not entitled to the same deference and are reviewed *de novo*. *XL Disposal Corp. v. Zehnder*, 304 Ill. App. 3d 202, 207 (1999).

## I. Due Process Violation Claims

On appeal, plaintiff contends that the evidence established the Board's bias against him where the Board allegedly (1) engaged in *ex parte* communications with Chief Zitek and failed to disclose documents Chief Zitek gave the Board *ex parte*; (2) violated the Open Meetings Act; and (3) failed to require Chief Zitek to follow Illinois's statutory framework pertaining to the disclosure of mental health records. We disagree.

■ Administrative hearings are governed by the fundamental principles and requirements of due process of law. *Krocka*, 327 Ill. App. 3d at 49. A fair hearing before an administrative entity must include the opportunity to be heard, the right to cross-examine adverse witnesses, and impartial rulings on the evidence. *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 95 (1992). Not all accepted requirements of due process in the trial of a case are necessary at an administrative hearing. *Waste Management of Illinois, Inc. v. Pollution Control Board*, 175 Ill. App. 3d 1023, 1036 (1988). Due process requirements are determined by balancing the weight of the individual's interest against society's interest in effective and efficient governmental operation. *Waste Management of Illinois, Inc.*, 175 Ill. App. 3d at 1037.

### A. *Ex Parte* Communications

Plaintiff contends that the Board's review of Chief Zitek's June 15 and September 23 letters and attachments constituted *ex parte* communications and prejudiced the Board against plaintiff. Plaintiff also argues that the Board's failure to disclose those attachments prevented him from learning the nature and extent of the *ex parte* communications and, thus, denied him a meaningful opportunity to rebut all the evidence presented to the Board.

■ A court will not reverse an agency's decision because of *ex parte* contacts with members of that agency absent a showing that prejudice to the complaining party resulted from such contacts. *Waste Management of Illinois, Inc.*, 175 Ill. App. 3d at 1043. There is a presumption that administrative officials are objective and capable of fairly judging a particular controversy. *Waste Management of Illinois, Inc.*, 175 Ill. App. 3d at 1040. Moreover, the fact that an administrative official has taken a public position or expressed strong views on an issue before the administrative agency does not overcome the presumption. *Waste Management of Illinois, Inc.*, 175 Ill. App. 3d at 1040. Where the administrative agency operates in an adjudicatory capacity, bias or prejudice may only be shown if a disinterested observer might conclude that the administrative body, or its members, had in some measure

adjudged the facts as well as the law of the case in advance of hearing it. *Waste Management of Illinois, Inc.*, 175 Ill. App. 3d at 1040.

■ Here, the Board treated Chief Zitek's June 15 and September 23 letters as the filing of disciplinary charges against plaintiff. Because a hearing was not commenced within 30 days,[1] the Board dismissed the three charges that pertained to plaintiff's allegations of *ex parte* contacts. Furthermore, prior to the commencement of the evidentiary portion of the hearing, counsel to the Board advised and admonished the Board that it could not consider any materials, information or communications received outside of the formal hearing process and must reach its decision based solely on the evidence and testimony presented during the formal hearing. Moreover, in the final administrative decision, the Board stressed that it had heeded counsel's admonishment. In addition, no evidence in the record suggests that the Board ever considered any of the extraneous materials in reaching its final decision. Counsel to the Board's simple and strongly worded admonishment to the Board to ignore any *ex parte* communications cured any prejudice resulting from the Board's extraneous knowledge of information concerning the dismissed charges. *Diamond v. Board of Fire & Police Commissioners*, 115 Ill. App. 3d 437, 444 (1983) (a simple and strongly worded admonition to the board to ignore the results of polygraph exams erroneously included in an administrative complaint would have cured the prejudice resulting from the Board's extraneous knowledge of the polygraph exams).

■ We find unpersuasive plaintiff's contention that evidence of the Board's bias is found in its June 16 letter to Chief Zitek, where the Board recommended a psychiatric evaluation and suggested that disciplinary action might include dismissal from the force. The statements in the Board's June 16 letter indicate concern over the allegations raised by Chief Zitek but do not demonstrate that the Board prejudged the facts and law concerning the insubordination and Cleary charges against plaintiff. The Board made no conclusion or prediction regarding plaintiff's employment but, rather, reserved any decisions pending the presentation of evidence at a formal hearing. Moreover, the Board provided a full and complete opportunity for plaintiff to offer evidence and refute the insubordination and Cleary charges.

---

[1] Section 10—2.1—17 of the Illinois Municipal Code provides that no police officer shall be removed or discharged except for cause, upon written charges, and after an opportunity to be heard in his own defense. The Board shall conduct a fair and impartial hearing of the charges, to be commenced within 30 days of the filing thereof, which hearing may be continued from time to time. 65 ILCS 5/10—2.1—17 (West 1998).

■ Plaintiff's claims of due process violations lack merit where the record established that the hearing took place on 12 separate days, extended over a period of 3 months and was bifurcated into liability and penalty phases. Plaintiff was represented by counsel and was granted continuance requests when his counsel was not able to attend. Furthermore, the Board considered numerous motions, arguments and briefs filed by both sides and ruled in favor of plaintiff on various motions and objections, such as when the Board dismissed three of the five charges originally alleged against plaintiff. In addition, plaintiff's counsel vigorously cross-examined Cleary and Chief Zitek and presented several of plaintiff's own witnesses.

## B. Opening Meetings Act

Next, plaintiff alleges that the Board deprived him of due process because the Board's discussions on June 16, September 25 and October 15, 1998, constituted secret meetings where no public notice of the meetings was given, no minutes were kept, and the Board did not act in open session, in violation of sections 2, 2.02 and 2.06 of the Open Meetings Act (5 ILCS 120/2, 2.02, 2.06 (West 1998)).

■ The Open Meetings Act, however, does not confer substantive rights for due process clause purposes with respect to the termination of public employees. *Kyle v. Morton High School*, 144 F.3d 448, 452 (7th Cir. 1998). Moreover, plaintiff's allegations of Open Meetings Act violations are time barred because he did not bring a civil action in the circuit court within 60 days of the meeting alleged to be in violation of the Act. 5 ILCS 120/3 (West 1998).

Notwithstanding the statute of limitations bar, the Open Meetings Act provides only that a court may declare "null and void any final action taken at a closed meeting in violation of this Act." 5 ILCS 120/3(c) (West 1998). Here, the June 16 and September 25 meetings pertained to charges that the Board dismissed and thus had no impact on the Board's final decision. Further, the order entered by the Board at the October 15 meeting, which suspended plaintiff without pay and set a hearing date, was nullified by the Board's subsequent action suspending plaintiff with pay and rescheduling the hearing. Accordingly, no final action from any meeting that violated the Open Meetings Act remained to impact plaintiff.

## C. Disclosure of Fitness Exam Results

Next, plaintiff contends that Chief Zitek's October 10 order that plaintiff release the results of his fitness exam compelled plaintiff to surrender his right to confidentiality of those records under the Mental Health and Developmental Disabilities Confidentiality Act (the Act) (740 ILCS 110/1 *et seq.* (West 1998)). Plaintiff argues that the result-

ing insubordination charge violated his due process rights under the Uniform Peace Officers' Disciplinary Act (50 ILCS 725/1 *et seq.* (West 1998)), which provides that an officer cannot be subject to disciplinary action for invoking a statutory or constitutional right. We disagree and find that the Act was not applicable to the situation involving the release of plaintiff's fitness exam results to Chief Zitek.

■ The Act provides that a therapist cannot disclose records or communications of mental health services unless the recipient of those services consents to the disclosure or the disclosure falls within certain exceptions enumerated in the Act. 740 ILCS 110/10(a) (West 1998). Mental health services include but are not limited to examination, diagnosis, evaluation, treatment, training, pharmaceuticals, aftercare, habilitation or rehabilitation. 740 ILCS 110/2 (West 1998). The Act also provides that in civil, criminal, administrative or legislative proceedings, the recipient of mental health services has the privilege to refuse to disclose those records except in certain enumerated situations, provided that any party to the proceeding or other interested person may request an *in camera* review of the record or communication to be disclosed. 740 ILCS 110/10(b) (West 1998). The Act, however, does not specifically address the disclosure of police officers' fitness exam results to their superior officers.

■ Illinois law is clear that Chief Zitek had the authority to order plaintiff to submit to a fitness exam. *Haynes v. Police Board of the City of Chicago*, 293 Ill. App. 3d 508, 512-13 (1997) (discharge of officer was proper because an officer does not have the prerogative to disobey an order to take a psychological exam while the officer subjectively determines whether the order was lawful, valid or reasonable); *Conte v. Horcher*, 50 Ill. App. 3d 151, 153-54 (1977) (there is no question as to the right and power of the police commissioner to conduct physical and mental examinations in order to determine whether patrolmen are able to perform their duties). The authority to order fitness exams is justified by the unique, almost paramilitary nature of police departments and the critical importance of police officers to public health and safety. By necessary implication, the police department must have access to the ultimate fitness determination of such exams in order to determine whether officers are capable of performing their duties.

■ Here, the evidence established that Chief Zitek ordered the fitness exam based on reports from a detective, a citizen, a police officer and a sergeant complaining about plaintiff's conduct. Because Chief Zitek's order that plaintiff submit to a fitness exam was reasonable, then logically Chief Zitek was entitled to view the results of that exam. There is no merit to plaintiff's claim that he could refuse to release the exam results to Chief Zitek without running the risk of a

sanction. Rule 12 of the Stickney police department rules and regulations requires officers to obey all orders of a superior officer. Accordingly, the Board had the right to discharge plaintiff for disobeying the order to release those results.

Plaintiff's reliance on several cases that found mental health information privileged under the Act is misplaced because those cases did not involve the fitness exams of police officers. See *Reda v. Advocate Health Care*, 199 Ill. 2d 47 (2002) (plaintiff seeking damages for neurological injury in a medical malpractice case did not place his mental condition at issue); *Norskog v. Pfiel*, 197 Ill. 2d 60 (2001) (defendant who participated in a court-ordered fitness-to-stand-trial exam for his murder trial did not waive Act confidentiality in a subsequent wrongful death civil action); *Mandziara v. Canulli*, 299 Ill. App. 3d 593 (1998) (plaintiff in a custody case did not place her mental health in issue); *Sassali v. Rockford Memorial Hospital*, 296 Ill. App. 3d 80 (1998) (in an involuntary commitment proceeding, the hospital could not directly release records to expert doctor appointed to examine plaintiff).

Plaintiff's citation to other cases where police officers' mental health records were found confidential is similarly unpersuasive because none of those cases involved either the Act or the disclosure of officers' fitness exams to their superiors. See *Jaffee v. Redmond*, 518 U.S. 1, 135 L. Ed. 2d 337, 116 S. Ct. 1923 (1996) (in a wrongful death action, common law privilege protected mental health records of officer who voluntarily underwent extensive counseling with a licensed clinical social worker); *Caver v. City of Trenton*, 192 F.R.D. 154 (D.N.J. 2000) (in a civil rights action brought by black officers, common law privilege protected the psychological evaluation of a white officer who did not voluntarily seek treatment and was told the evaluation was confidential and would not be disclosed to city personnel); *Williams v. District of Columbia*, No. Civ. A. 96—0200—LFO (D.D.C. April 25, 1997) (in a wrongful death action, common law privilege protected the psychological evaluation of an officer where the fitness exam was mandatory and the police department received only the ultimate fitness for duty recommendation).

Significantly, the Act and case law indicate that the recipient's expectation of privacy is dispositive in determining the disclosure of mental health information. *E.g.*, *Scott v. Edinburg*, 101 F. Supp. 2d 1017, 1020 (N.D. Ill. 2000) (common law privilege did not protect an officer's fitness exam results in a subsequent wrongful death action because no expectation of privacy was established where the officer was informed that the results would be reviewed by the chief and might be subpoenaed in a civil suit, and the officer refrained from

making statements based on the lack of confidentiality). Plaintiff contends that he, unlike the officer in *Scott*, established his expectation of privacy because he reported for testing but would not sign the confidentiality release forms and attempted to safeguard his privacy by limiting disclosure to attorneys until an *in camera* inspection could be conducted. However, as a police officer, plaintiff had no reasonable expectation that the results of his fitness exam would be kept confidential from Chief Zitek because fitness exams are part and parcel of the process officers must undergo in order to be hired and retained.

We are mindful that the Act constitutes a strong statement by the General Assembly about the importance of keeping mental health records confidential and that confidentiality motivates people to seek needed treatment and is essential to the treatment process. See *Norskog*, 197 Ill. 2d at 71-72. The Act, however, is not applicable to the facts here, where Chief Zitek's testimony and his order established that he did not compel the release of plaintiff's mental health records, but only the ultimate fitness for duty recommendation.

## II. Manifest Weight of the Evidence

Plaintiff contends that the Board's finding that he refused to release the exam results was erroneous where the results were released to Chief Zitek's attorney, who plaintiff claims agreed to an *in camera* inspection by the court. Plaintiff also contends that the Board's finding sustaining the Cleary charge was against the manifest weight of the evidence because the Board ignored the testimony of Officer Sedlacek and plaintiff's wife, which plaintiff claims fully exculpated him. We disagree.

Because the Board is an administrative agency, its findings of fact on review shall be held to be *prima facie* true and correct. 735 ILCS 5/3—110 (West 1998); *Launius*, 151 Ill. 2d at 427. The reviewing court does not resolve factual inconsistencies and does not reweigh the evidence and then determine where the preponderance of the evidence lies. *Launius*, 151 Ill. 2d at 427-28. Rather, the reviewing court inquires whether the findings of the administrative agency are against the manifest weight of the evidence. *Launius*, 151 Ill. 2d at 428. Under the manifest weight standard, we are able to overturn the Board's decision only if, after reviewing the evidence in a light most favorable to the Board, we determine that no rational trier of fact could have reached the conclusion reached by the Board. *Krocka*, 327 Ill. App. 3d at 46.

Concerning the insubordination charge, plaintiff's assertion that the parties had an agreement to attempt an *in camera* review of plaintiff's fitness exam results is not entirely accurate. Although the

parties agreed that the results would be released to plaintiff's attorney and Chief Zitek's attorney, the evidence at the administrative hearing established that Chief Zitek's attorney was not at liberty to release those results to Chief Zitek. Moreover, plaintiff refused to agree to an *in camera* review until after an expert either tested plaintiff or reviewed Dr. Gunn's report. The record supports the Board's findings that plaintiff delayed in submitting to the fitness exam from June until September 1998 and then disobeyed the October 10 order to release the results to Chief Zitek.

Concerning the Cleary charge, the Board viewed the witnesses directly, weighed their credibility and did not find the testimony of Officer Sedlacek sufficient to impeach Cleary. Moreover, the testimony of plaintiff's wife—that she was asleep when the telephone threats were made—hardly exculpated plaintiff. Plaintiff's counsel cross-examined Cleary extensively concerning his alleged motive to fabricate his testimony, and the record indicates that Officer Sedlacek's police report concerning the telephone threats was incomplete and inaccurate.

### III. Plaintiff's Discharge

Plaintiff contends that the Board's decision that cause existed to discharge plaintiff was arbitrary, capricious and unrelated to the requirements of service and therefore must be reversed. Plaintiff reiterates his argument that the Board erred in finding that he refused to disclose the results of his fitness exam where plaintiff invoked his right to confidentiality under the Act. Plaintiff argues that Chief Zitek should have followed the statutory protocols of the Act to compel the disclosure of the results and waited for a court *in camera* inspection. We disagree.

Review of an administrative agency's decision regarding discharge requires a two-step analysis. *Krocka*, 327 Ill. App. 3d at 46. The court must determine (1) whether the agency's findings are contrary to the manifest weight of the evidence, and (2) whether the findings of fact provide a sufficient basis for the agency's conclusion that cause for discharge does or does not exist. The agency's decision as to cause will not be reversed unless it is arbitrary, unreasonable, or unrelated to the requirements of service. *Krocka*, 327 Ill. App. 3d at 46.

The Board has considerable latitude and discretion in determining what constitutes cause for discharge. *Kappel v. Police Board*, 220 Ill. App. 3d 580, 590 (1991). The courts have defined cause as some substantial shortcoming that renders the employee's continuance in his office or employment in some way detrimental to the discipline and efficiency of the service and that the law and

18

public opinion recognize as good cause for his no longer holding the position. *Krocka*, 327 Ill. App. 3d at 47.

Because the Board, and not the reviewing court, is in the best position to determine the effect of an officer's conduct on the department, the reviewing court is required to give the Board's determination of cause for terminating an officer considerable deference. *Valio v. Board of Fire & Police Commissioners*, 311 Ill. App. 3d 321, 330-31 (2000). As the reviewing court, we may not consider whether we would have imposed a more lenient disciplinary sentence. *Krocka*, 327 Ill. App. 3d at 48.

As discussed above, Chief Zitek's order that plaintiff undergo a fitness exam and release the results to Chief Zitek was a proper order. Accordingly, the Board's finding that plaintiff was insubordinate was not contrary to the manifest weight of the evidence where plaintiff never complied with that order. Disobedience to a proper order given by a superior officer is cause for discharge. *Panthera v. Village of Oak Lawn*, No. 01 C 3059 (N.D. Ill. October 10, 2002); *Haynes*, 293 Ill. App. 3d at 512; *Calomino v. Board of Fire & Police Commissioners*, 273 Ill. App. 3d 494, 499 (1995) (even a single violation of the police department rules authorized the dismissal of a police officer). Thus, the Board's determination that plaintiff's conduct constituted cause for discharge was neither arbitrary nor unreasonable. An officer who disobeys a proper order concerning a fitness exam and threatens a member of the public will impair the discipline and efficiency of the police force. Plaintiff's insubordination and threatening conduct constituted substantial shortcomings that rendered his continued employment as a police officer detrimental to the discipline and efficiency of the service.

## CONCLUSION

The judgment of the circuit court affirming the decision of the Board is affirmed.

Affirmed.

GORDON, P.J., and O'MALLEY, J., concur.